FILED

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

LINDA HOPSON,

    PLAINTIFF,

v.                                          CASE NO.: CV-03-J-3135-S

CITY OF BIRMINGHAM,

    DEFENDANT.

ENTERED
OCT 27 2004

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 14), memorandum and evidence in support of said motion (doc. 15) and the plaintiff's brief and evidence in opposition (docs. 19-20). Having considered the pleadings, evidence and memoranda of the parties, the court finds as follows:

### I. Factual Background

Plaintiff sues her employer for violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, for gender discrimination. The plaintiff is a female firefighter/medic who asserts she was treated differently than her male counterparts. Complaint, ¶ 8. She began working for the defendant on March 1, 1993, completed her Firefighter I certificate in 1994, and finished her paramedic training in 1998 or 1999. Plaintiff depo. at 18-19, 42; Murray depo. at 35.[1] She suffered an on the job injury to her back on January 5,

---

[1] Dewayne Murray is the Fire Chief for the defendant. Murray depo. at 5.

2002. Plaintiff depo. at 46, 58-64. At the time she was the acting officer on the A shift for the Rescue Unit. *Id.*, at 46. The plaintiff was released by her treating physician to return to full duty work on March 6, 2003.[2] *Id.,* at 64-65, 72-73, 91.

Upon her return to work, the plaintiff was assigned to an engine company and told she could not return to the Rescue Unit until she was retrained at recruit school.[3] Plaintiff depo. at 71, 75; Murray depo. at 166-167. In deposition, the plaintiff admits she was not required to go to recruit school, but did have to complete training modules. Plaintiff depo. at 75-76, 95, 115.

Chief Murray instructed the Training Division to create training modules for anyone who had been out of the Fire Service fore more than one year, for any reason. Murray depo. at 48-49. A firefighter had died in a training event going through Job Task, which made defendant change how it operates.[4] *Id.* at 49; 102-103, 122. Now,

---

[2] The plaintiff was placed on Injured with Pay ("IWP") status after her injury. Hopson affidavit, ¶ 5. She returned to work on limited duty on August 30, 2002, *Id.*, ¶ 7. She was thereafter released to full duty on March 6, 2003. *Id.*, ¶ 10.

[3] The assignment to a rescue unit paid an additional 10% of the plaintiff's salary. Plaintiff depo. at 42. According to David Nathan, Assistant Fire Chief, all medics receive the additional 10%, regardless of whether or not they are assigned to a rescue unit. Affidavit of Nathan, submitted as defendant exhibit 3. Plaintiff asserts she was denied this premium from February 2002 to April, 2003, when she was on IWP and when she was performing limited duty, non-paramedic work. Plaintiff affidavit, ¶¶ 6, 21. However, she also states she was denied the premium when she reinjured her back in October, 2002, and had to take 104 hours of sick leave because she was denied IWP. Hopson affidavit, ¶¶ 8, 21.

[4] Murray was Deputy Chief at the time. Murray depo. at 104. The changes made were based on recommendations by OSHA in 2001. *Id.*, at 103-105, 107-108.

after completing the Fit Check and Job Tasks, the officers are put back to work, then given the modules to complete as time allows. *Id.*, at 170-171, 174.

The plaintiff had to complete Fit Check and Job Tasks assignments before she could be reassigned to the Rescue Unit.[5] Plaintiff depo. at 76. The plaintiff states she also had to complete "modules" before she could return to her normal assignment. *Id.*, at 86. She felt this requirement was harassment. *Id.*, at 88, 90. Upon complaining to Fire Chief Dewayne Murray about having to go to recruit school when Brent Nichols did not, the plaintiff claims he replied that he could do what he wanted with female firefighters. *Id.*, at 90-91. He further told the plaintiff to get out of his office and she could sue him.[6] *Id.*, at 92, 210.

According to Chief Murray, he tried to explain to the plaintiff that this was an opportunity to hone her skills. Murray depo. at 150. He also told the plaintiff that he was disappointed that she believed he was doing something adverse to her. *Id.*, at 153.

---

[5]The Fit Check is a physical agility test which all firefighters have to pass once a year. Murray depo. at 56, 59. Job Task involves job simulation, such as pulling hoses. *Id.*, at 64-65. These are both annual requirements for all firefighters. *Id.*, at 66-67; Plaintiff depo. at 78-79. The plaintiff complains that high ranking individuals within the fire department, watched her complete these tests. Underwood agreed that was very unusual. Underwood depo. at 33. The only other time he could recall was after another woman firefighter was injured and came back to work. *Id.* at 34. He also agreed that assistant chief of training Dave Nathan actually administering the plaintiff's Fit Check was not routine. *Id.* at 36-37.

[6]The plaintiff later explains that she asked Chief Murray, "If I were the person having a relationship with you. If I were the one you were so cozy with, would we be having this talk [about recruit school]?" Plaintiff depo. at 208-209. Chief Murray replied that he was offended and that the plaintiff acted like he was making rules just for her. *Id.*, at 209.

He told her she may have to go to recruit school, as two male firefighters had.[7] *Id.*, at 155-156. Murray stated that he did not send the plaintiff to recruit school because he needed her back at work, due to short staffing problems. *Id.*, at 157. He agrees that there was no written policy mandating the module training. *Id.*, at 153. He told the plaintiff, "If I have to get sued to assure that employees are healthy and safe and fit to go to work, so, if that's the case, sue me." *Id.*, at 159.

The plaintiff asserts she was similarly situated to firefighter Brent Nichols, but they were treated differently by the defendant.[8] Nichols was hired at the same time as plaintiff, and had an injury which required him to be off work for 18 months. Plaintiff depo. at 91, 147; Murray depo. at 91. The plaintiff states that Nichols did not have to complete modules before being returned to his regular position. Plaintiff depo. at 90-91. Rather, she believed Nichols only had to complete the Fit Check and Job Task to be placed back at work. *Id.*, at 91, 117, 147. Additionally, the plaintiff asserts that Nichols and other male firefighters were scheduled for their Fit Check and Job Task within two or three days, whereas the plaintiff had to wait a month. *Id.*, at 195; plaintiff affidavit, ¶ 11. *See also* depo. of Wiley Porterfield, at 8-9 (stating that after he returned from military duty, he took his Job Task and Fit Check within three

---

[7]Murray testified that he thought requiring a return to recruit school was a state requirement, but later learned it was not. Murray depo. at 158.

[8]Mr. Nichols was not a medic. Nathan affidavit, at 3.

4

days of requesting to return to work); depo. of Timothy Silas at 11-13. Additionally, the male firefighters were immediately placed back in their same positions, although at a different location. Plaintiff depo. at 196-197.

According to Murray, the first individual to come back from an injury after the firefighter's death was Brent Nichols. Murray depo. at 50. Murray required him to spend two weeks in training one on one with a safety officer, but the defendant could not afford to have one training officer or safety officer out of service for one on one training. *Id.,* at 50; 75, 127-128; *see also* affidavit of Jeffery Ray,[9] submitted as defendant exhibit 4; affidavit of Arc Peterson,[10] submitted as defendant exhibit 5. Thus, he decided to check proficiency for returning officers through training modules. Murray depo. at 51. He thereafter extended this training to anyone out of service for more than one year, regardless of the reason. *Id.,* at 52, 117, 146, 188.

Chief Murray agrees that the training modules began with the plaintiff's return to work. Murray depo. at 52, 127. However, the modules covered the same tasks Nichols was required to complete.[11] Murray depo. at 110; Ray affidavit, at 2. Male

---

[9] Mr. Ray works for the defendant in the Training and Safety Division. Ray affidavit, at 1.

[10] Arc Peterson is a Captain with defendant assigned to the Bureau of Training and Safety.

[11] The modules covered tasks relating to firefighting. Underwood depo. at 58-59. Everyone in the Operations Division is considered a firefighter. *Id.* at 60. Medics are firefighters also, with firefighter gear, and are expected to remain able to put on firefighter equipment and go into a fire. *Id.* at 26.

firefighters returning to work after the plaintiff also had to complete the module training.[12] Murray depo. at 111, 149, Anderson depo. at 45.[13]

The plaintiff testified that several males with less seniority were placed in rescue unit positions while the plaintiff was "pooled."[14] Plaintiff depo. at 211. She states this violated the department policy, which required individuals with seniority to be assigned prior to those with less seniority. *Id.*, at 212. She states three or four people with less seniority were assigned ahead of her. *Id.*, at 213-214. The plaintiff did medic work when she was "pooled" out to other stations. *Id.*, at 201. She states that she was "used at their convenience to do the job that they said I wasn't qualified to do when they wanted me to." *Id.*, at 216.

According to Nathan, the plaintiff was not immediately assigned to a rescue unit because there was no opening. Nathan affidavit at 2. She was pooled as a medic due to a medic shortage. Nathan affidavit at 3; *see also* Brown depo. at 26.[15] The

---

[12] Wiley Porterfield testified he had to complete modules after returning from military leave. Porterfield depo. at 11. Timothy Silas did not have to complete modules. Silas depo. at 13. They were mentioned to him, but "the issue wasn't pushed." *Id.* However, he also testified that, as a firefighter, he does training daily, such as ropes and knots. *Id.*, at 20.

[13] Reginald Anderson was Chief of Training for defendant during the relevant time period. Anderson depo. at 33.

[14] The department normally used the pool to fill a position until the injured employee came back to work. Plaintiff depo. at 214.

[15] William Brown was in charge of Communications. Brown depo. at 27.

defendant alleges that it has many more positions for firefighters on engine units than for rescue units. Affidavit of Nathan.

The plaintiff also states that, before she did them, she did not know what the training modules would be, but knew no other firefighter returning from an injury had to do them. Plaintiff depo. at 92. Everyone in her station completed the modules, but she was the only one graded.[16] *Id.,* at 96, 98-99. Arc Peterson made the recommendation that everyone at the station complete the modules as everyone is better off when firefighters improve their skills. Affidavit of Peterson, at 3. The modules were pass/fail. Plaintiff depo. at 96. She worked on the modules from April 27, 2003 until May 12, 2003. Plaintiff depo. at 105; defendant exhibit 1 to plaintiff depo. The plaintiff only worked on the modules when she wasn't "pooled out" to other rescue units. Plaintiff depo. at 107, 121-122. Everyone else at that station was male. *Id.,* at 111. The plaintiff states that everyone at the station resented that they had to complete the modules because of the plaintiff being assigned there. *Id.,* at 165. The plaintiff testified that the modules consisted of tasks she had performed in recruit school. *Id.,* at 168, 170. She found the tasks demeaning and her co-workers felt like they were being punished. *Id.,* at 170.

---

[16]Murray explained that he thought doing remedial modules would not only be beneficial for the employee returning to work, but also that person's co-employees, so the co-employees would feel comfortable with that individual getting their skills back. Murray depo. at 147.

After completing the modules, the plaintiff was reassigned to a full time rescue unit.[17] Plaintiff depo. at 121-122, 177; plaintiff affidavit, ¶ 20. The plaintiff has since been promoted to an Apparatus Operator.[18] Plaintiff depo. at 123-124, 133. The plaintiff claims she was passed over for this promotion two times because she was forced to take time she was out as sick leave rather than "injury with pay" (IWP), which counted against her.[19] *Id.,* at 137-138, 141-142, 150, 152. The plaintiff later states she received 180 days of IWP, which was all that was allowed for IWP. Plaintiff depo. at 172, 175; Murray depo. at 133; 182. The plaintiff received pay for all of the time she was not working full duty. Plaintiff depo. at 157.

The plaintiff states because of the delay in placing her back as a full-time paramedic, she lost the opportunity to work extra jobs at venues where paramedics were requested. Plaintiff depo. at 140, 150. She estimates this delay as from March 6, 2003 until April 3, 2003. *Id.,* at 138, 140-141. She normally worked four to six such events per month. *Id.,* at 141. She was able to return to getting these extra jobs

---

[17]Chief Murray does not make personnel assignments. No one has a permanent working position within the fire department. Murray depo. at 191.

[18]This means that the plaintiff can now drive the fire engine. Murray depo. at 20; 48.

[19]The plaintiff has not stated a claim in either her EEOC charge or her Complaint for "Failure to Promote." *See* defendant exhibit 2 to plaintiff depo.

the same day she passed her Fit Check and Job Task.[20] *Id.,* at 174-175. *See* affidavit of Charles Gordon, submitted as defendant exhibit 6.

According to the plaintiff, before Chief Murray became the interim chief, women were respected and did not have as many problems with the men.[21] Plaintiff depo. at 197. Chief Murray denies he treated the plaintiff differently than male employees. Murray depo. at 44. He testified to several males who were sent through additional training upon each returning to active duty. *Id.,* at 71. Phillip Underwood was sent back to recruit school after being on military leave. *Id.,* at 71-72; Underwood depo. at 14. At the time, the state required a return to recruit school after an extended leave of absence. Underwood depo. at 14, 15. Each of the males went to recruit school upon their return, when Murray's predecessor was still in office. Murray depo. at 73-74.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*

---

[20] In fact, plaintiff was working one of these extra jobs when she spoke to the Mayor about the perceived harassment. Plaintiff depo. at 179.

[21] Murray became the Interim Fire Chief in February, 2002. Murray depo. at 15. At some point thereafter, he was appointed Fire Chief. Murray depo. at 16.

9

*v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.Pro. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). The

non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

### III. LEGAL ANALYSIS

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Sprint/United Management Co.* 246 F.3d 1305, 1311 (11th Cir.2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000). With these standards in mind, the court considers each of the plaintiff's claims.

A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination. *Wilson v. B/E Aerospace, Inc,.* 376 F.3d 1079, 1088 (11th Cir. 2004), citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48, 120 S.Ct. 2097, 2108-09, 147 L.Ed.2d 105 (2000).

Plaintiff asserts that the above facts constitute gender discrimination. As the court can find no direct evidence of discrimination, the court applies the analysis required for circumstantial evidence. This court must apply a three prong test fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973). *See also Texas Department of Community Affairs v.*

*Burdine,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981). First, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824. Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Assuming the employee meets this burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996). The defendant can feasibly present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted. *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir.1991), *cert. denied,* 502 U.S. 1058 (1992)(quoting *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 596 (11th Cir.1987).

Once a defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094 and n. 10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the

12

motivation behind the defendant's adverse employment action directed at plaintiff. *Harris*, 99 F.3d at 1083.

The plaintiff meets her prima facie burden of proof by establishing that (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected classification more favorably. *Wilson*, 376 F.3d at 1087; *Rice-Lamar v. City of Fort Lauderdale, Florida,* 232 F.3d 836, 842-43 (11th Cir. 2000), citing *Holifield v. Reno,* 115 F.3d 1555, 1562-63 (11th Cir.1997).

The court has carefully read the plaintiff's and the defendant's evidentiary submissions. The plaintiff meets the first two elements of her *prima facie* case. As a female, the plaintiff is a member of a protected class. The parties do not dispute that she is qualified for her job. However, the court cannot find an adverse employment action. According to the plaintiff, no one before her had to undergo training modules upon his or her return to work. She does not dispute that everyone who has come back to work after more than a one year absence, male and female, has had to complete the training modules. The plaintiff complains that the use of sick time was held against her in being promoted to an apparatus operator, but she admits that she received all of the IWP leave she could, 180 days. She states that the delay in her Fit Check and Job Task prevented her from receiving *additional* income working as a paramedic at special events, but this is not an adverse action.

13

Not all conduct by an employer negatively affecting an employee constitutes adverse employment action. This limitation is consistent with the basic principle that "Title VII[ ] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Gupta v. Florida Brd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999)). To support a claim under Title VII, the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. *Davis v. Town of Lake Park, Fla.* 245 F.3d 1232, 1239 (11th Cir.2001). To prove adverse employment action, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. *Id.* Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. *Id. See also Gupta*, 212 F.3d at 587 ("An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."); *Bass v. Board of County Com'rs, Orange County, Fla.* 256 F.3d 1095, 1118 (11th Cir.2001).

The court finds that being required to undergo training after being off work as a firefighter for more than a year is not a serious alteration of the terms of the plaintiff's employment, nor did such training affect the plaintiff's employment status.[22]

The court finds this case distinguishable from *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir.2001). Unlike the plaintiff in that case, here the plaintiff was given the same duties as other firefighters. She was given routine work assignments. As soon as the plaintiff was certified as fit, she was placed on the schedule to earn additional pay from working at special events. When a position became available, she was reassigned to a Rescue Unit.

The plaintiff states as the basis for her discrimination claim that she had to undergo additional training in the form of completing modules. Assuming arguendo that this was an adverse employment action, the plaintiff has no evidence that all males in her situation after her did not have to complete the same training. Additionally, she does not refute that males in her situation before her went to recruit school, which plaintiff did not, or had intensive one on one retraining, which plaintiff did not. The fact that the defendant changed its method to ensure the ability of its

---

[22] Even if the court could find a negative effect on plaintiff's employment status, it was necessarily *de minimus*, at most. The plaintiff was released to full duty in March, 2003. She was reassigned to a rescue unit in June, 2003. She was placed on the schedule for special events beginning in April, 2003. Since then, plaintiff has been promoted to an Apparatus Operator.

15

firefighters returning to duty, and did so beginning with the plaintiff, does not make it an adverse employment action.

The court finds the facts, as drawn from that evidence, simply do not support the plaintiff's allegation of gender discrimination. The court's role is not to act as a super personnel department that second-guesses employers' business judgments. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir.2000). Rather, the court must consider whether unlawful discriminatory animus motivated a challenged employment decision. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999). *See also Wilson*, 376 F.3d at 1092. In the facts of this case, the court can find no decision motivated by a discriminatory animus.

Having considered the foregoing, the court is of the opinion that the defendant's motion is due to be granted. The court shall so rule by separate Order.

**DONE** and **ORDERED** this the 27 day of October, 2004.

_____
INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE